[Docket No. 25.]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| MALIKUDDIN MOHAMMADI, individually, and as a personal representative of the Estate of Shaima Mohammadi, deceased, on behalf of said Estate, and MALIKUDDIN MOHAMMADI, as Guardian for A.M., a minor, and in his own right,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil A. No. 24-6950 (RMB/MJS)<br><br>**OPINION** |

**RENÉE MARIE BUMB, Chief United States District Judge:**

Plaintiff Malikuddin Mohammadi, his pregnant wife Shamia Mohammadi, and their young son A.M. fled Afghanistan as the Taliban regained control over the country. The Mohammadis came to America as part of a United States military operation to evacuate Americans and Afghan nationals who had assisted the United States during its occupation of Afghanistan. When they reached the United States, the Mohammadis came to reside at Joint Base McGuire-Dix-Lakehurst in New Jersey. While housed at the base, Shaima was sick, and she and her unborn baby tragically died from acute respiratory failure.

Malikuddin, on behalf of himself and his wife's estate, and their son, A.M., filed this Federal Tort Claim Act ("FTCA") suit against the United States for, among other things, wrongful death. The Government now moves to dismiss, arguing this Court lacks subject matter jurisdiction based on, among other reasons, the FTCA's independent contractor exemption. Malikuddin pushes back, contending it is premature for this Court to dismiss on the independent contractor exemption, and asks this Court for jurisdictional discovery.

The Court agrees with Malikuddin. For the reasons set forth below, the Court will deny the Government's motion without prejudice and order jurisdictional discovery. The Government may renew its motion to dismiss after limited jurisdictional discovery has been completed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Operation Allies Welcome

When the United States withdrew from Afghanistan in 2021, the State Department requested military assistance to evacuate and support government officials, American nationals, and Afghan nationals with Special Immigration Visas. [Gov't Mem. of Law in Supp. of Mot. to Dismiss 4 ("Gov't Br.") (Docket No. 25-1).] As part of this effort, called Operation Allies Welcome ("OAW"), the Department of Defense helped house Afghan individuals and families on installations including Joint Base McGuire-Dix-Lakehurst in New Jersey (the "Base"). [*Id.*] This Base was the installation where the Mohammadis would come to reside. [Am. Compl. ¶¶ 25–26

(Docket No. 19).]  The Government contracted with private companies to provide housing and a range of other services, including medical care. [Gov't Br. at 1.]

The Air Force contracted with URS Federal Services International, Inc. ("URS") to provide the services at the Base and their subcontractor International SOS Government Services ("ISOS") provided medical facilities and services.  [*Id.* at 4–8.] Under OAW, the Air Force issued a task order to URS to provide life support camps, including at the Base.  [Decl. of Carolina Brost ("Brost Decl.") (Docket No. 25-2), Exhibit A ("Task Order") (Docket No. 25-3).]  The order incorporated a performance work statement that included requirements for medical services.  [Task Order at 3; Brost Decl., Exhibits B–D (Docket Nos. 25-4, 25-5, 25-6).]  The contract required URS to provide immigration medical exams by supplying, among others, doctors, lab technicians, phlebotomists, nurses, and equipment.  [Brost Decl., Exhibit C at § 1.1 ("Med. Contract Reqs.") (Docket No. 25-5).]  URS was also required to screen and test for communicable diseases, including tuberculosis, and to coordinate follow up treatment for positive results.  [*Id.*]  The contract requirements also provided that URS must "[i]dentify patients that have critical health concerns, [and] report them to the USG[1] representatives to expedite their processing[.]"  [*Id.* at § 1.2.]  It also required URS to "[c]oordinate for follow up appointments at Role 2 with staff or local hospitals and HHS for urgent care requirements[.]"  [*Id.*]  URS also had the responsibility of providing 24/7 basic primary care, obstetrics and gynecology and prenatal care, and

---

[1] This document defines "USG" as shorthand for the United States Government.  [Med. Contract Reqs. at § 1.1.]

more, as well as follow-ups. [*Id.*] URS was also required to provide trained medical personnel, provide supplies and equipment, and handle case management, patient administration, appointment scheduling, and other responsibilities. [*Id.*] URS also had to provide a Site Manager and an Alternate Site Manager in their absence who was "responsible for meeting Contractor's work requirements, including scheduling of personnel, work supervision, and quality control for all tasks." [Brost Decl., Exhibit B at §§ 1.2.3.1.1–2 ("Performance Work Statement") (Docket No. 25-4).] URS needed to meet with government personnel to discuss its performance, but the frequency of their meetings could be limited if there were no performance deficiencies. [*Id.* at § 1.2.5.] URS was also required to provide monthly performance and cost reports and "Flash reports" regarding certain critical information. [*Id.* at § 1.2.4; *Id.* App'x E.]

URS's subcontractor ISOS was to provide "round the clock medical service" and monitor patients retained for care. [Brost Decl., Exhibit D at § I(2)(b)(xii) ("ISOS Work Statement") (Docket No. 25-6).] URS was also to make referrals to specialists and off-site care and ISOS had to maintain a referral management program. [Med. Contract Reqs., Exhibit 1; ISOS Work Statement, Exhibit A ¶ 9.] ISOS personnel also were required to identify themselves as contractor personnel to avoid creating an impression that they were government employees and ISOS had to maintain professional liability insurance. [ISOS Work Statement at § I(2)(b)(xv); *Id.* Attachment F.] URS was responsible for monitoring the subcontractors and for reporting about that monitoring in their monthly reports. [Performance Work Statement at § 4.2.]

HHS contracted with U.S. Committee for Refugees and Immigrants ("USCRI") and its subcontractor Point Comfort Underwriters ("PCU") to provide health coverage for off-site medical services, including specialty care, received by Afghan evacuees under OAW. [Decl. of Kenneth B. Tota ¶ 4 ("Tota Decl.") (Docket No. 25-8).] Before October 2021, if a need for specialty care arose, contract medical staff were to submit an "Approval For Specialty Referrals Limited Coverage for Medical Assistance" (the "ASR Form") to ORR for coverage processing. [Tota Decl. ¶¶ 6–9.] After October 2021, off-site specialty care was available through PCU's in-network providers. [Tota Decl. ¶ 9.]

### B. The Mohammadis Come to America

After working in a security capacity for the United States in Afghanistan from approximately 2007 to 2021, Plaintiff Malikuddin Mohammadi applied for asylum through the Special Immigrant Visa Program. [Am. Compl. ¶¶ 20, 22.] While he was awaiting his interview, the Taliban re-entered Kabul and the Mohammadis were evacuated first to Dubai and then to the United States. [*Id.* ¶¶ 23–24.] As part of OAW, the family was eventually housed at the Base. [*Id.* ¶¶ 25–27.]

While at the Base, on November 2, 2021, Malikuddin's wife and decedent, Shaima, presented to an immigration official for a medical evaluation. [*Id.* ¶ 31.] She was pregnant at the time. [*Id.* ¶ 30.] They tested her for tuberculosis and the results were "borderline" and "indeterminate." [*Id.* ¶ 33.] She was also seen by obstetrics, where she reported coughing blood for two months and abdominal pain. [*Id.* ¶ 34.] She then saw Edward Morrison, NP, who documented that she did not cough during

his examination, but he ordered a chest x-ray and noted the x-ray appeared to show questionable infiltrates.[2]  [*Id.* ¶¶ 35-37.]  Arthur Greene, MD reviewed the x-ray and advised that Shaima be given a chest CT to check for causes such as infection, tuberculosis, and carcinoma.  [*Id.* ¶ 39.]  NP Morrison entered a medical note stating, among other things, that he had met with a physician (whose name was not legible) and that their plan of care was to obtain QuantiFERON[3] and a complete blood count[4] test, and that if they could not rule out tuberculosis, an MRI may be indicated.  [*Id.* ¶ 40.]  Case management referred Shaima for an urgent appointment in the morning, and her QuantiFERON-TB test was negative.  [*Id.* ¶¶ 41–42.]  A provider—whose name appears to be "J. Arno, CRN"—documented that they were working with infection control on sputum collection[5] for further testing, which appears to not have happened, so Malikuddin alleges tuberculosis was not officially ruled out.  [*Id.* ¶¶ 43–44.]  NP Morrison, however, documented that there was no evidence of an active infection and tuberculosis had been ruled out and that Shaima likely was recovering from pneumonia.  [*Id.* ¶ 45.]

---

[2] Pulmonary or lung infiltrates are abnormal substances that appear in the lungs during screening tests such as pus, immune cells, or tumor cells. *See* Aminah Wali, *What Are Lung Infiltrates? Causes and Risk for Lung Cancer*, MYLUNGCANCERTEAM (May 14, 2024), https://www.mylungcancerteam.com/resources/what-are-lung-infiltrates-causes-and-risk-for-lung-cancer.

[3] QuantiFERON is a blood test used to detect tuberculosis. *See* Qiagen, *QuantiFERON-TB Gold Plus – world's leading tuberculosis blood test,* QIAGEN, https://www.qiagen.com/us/tb-testing/what-is-quantiferon (last visited July 21, 2025).

[4] A complete blood count (CBC) test is a test run on a blood sample that provides information on cell and platelet counts and can be used to diagnose infection and disease. *See Complete blood count*, MEDICAL DICTIONARY OF HEALTH TERMS, https://www.health.harvard.edu/a-through-c#C-terms (last visited July 21, 2025).

[5] A sputum culture is a test that uses mucus from the lungs to diagnose a number of illnesses including tuberculosis. *See* Cleveland Clinic, *Sputum Culture*, CLEVELAND CLINIC (Aug. 4, 2023), https://my.clevelandclinic.org/health/diagnostics/25174-sputum-culture.

Another unidentified provider then saw Shaima for her bloody emesis.[6]  [*Id.* ¶ 46.]  On an unknown date, a healthcare provider "Oweis" also filled out an ASR Form for referral and evaluation by pulmonology and a CT scan, documenting potential adverse outcomes including "death" and indicating that the referral should be a "priority."  [*Id.* ¶ 47; Tota Decl., Exhibit A (the "ASR Form") (Docket No. 25-9).]  The ASR Form specifically mentioned in its header that the HHS and ORR oversee "specialty appointments for conditions which, if not addressed within 30 days, are expected to result in serious jeopardy to a patient's life or cause serious impairment to organ systems/bodily functions or parts" and said "HHS staff must complete the form and upload it to USCRI's SharePoint."  [Am. Compl. ¶¶ 48–49; ASR Form.]

That ASR Form's ultimate fate is unclear.  Malikuddin alleges Oweis submitted the ASR Form to the Government by and/or through HHS and/or ORR, but that the referral was not timely approved or acknowledged and as a result Shaima was not seen by pulmonology and did not undergo a CT scan.  [Am. Compl. ¶¶ 50–52.]  The Government asserts that ORR never received the form.  [Tota Decl. ¶¶ 10–12.]

At any rate, on December 24, 2021, Shaima experienced contractions and stated that she "wanted to push."  [Am. Compl. ¶ 55.]  She and her fetus were evaluated, and her oxygen saturation was 82%, and 10 liters were required to raise it to 100%.  [*Id.* ¶ 56.]  She was sent in an ambulance from the Base to Virtua Mt. Holly Hospital, where she was again placed on oxygen to raise her oxygen saturation.  [*Id.* ¶¶ 57, 59–60.]  An

---

[6] Bloody emesis refers to the vomiting of blood. *See* Cleveland Clinic, *Vomiting Blood*, CLEVELAND CLINIC (June 10, 2022), https://my.clevelandclinic.org/health/symptoms/17708-vomiting-blood.

attending obstetrician evaluated Shaima, and the doctor was concerned about the risk of pulmonary embolism, tuberculosis, or pneumonia and ordered referrals to infectious disease, pulmonology, hospitalist service, and maternal fetal medicine. [*Id.* ¶¶ 61, 63.] Over the course of the evening, Shaima's respiratory status declined, and both she and her baby boy died. [*Id.* ¶¶ 64–78.]

### C. Malikuddin Files an Administrative Claim with the Air Force and this Lawsuit

Malikuddin first pursued an administrative claim, filing an SF-95 and accompanying exhibits with the Air Force on behalf of himself individually and as administrator of Shaima's estate. [Decl. of Daniel G. Lemieux ("Lemieux Decl.") (Docket No. 25-11), Exhibit 1 (the "SF-95") (Docket No. 25-12).] The SF-95 lists 30 forms of alleged negligence by the Government, generally encompassing the failure to diagnose and treat Shaima's tuberculosis; improperly ruling tuberculosis out; not ordering the proper tests; not referring or following up to refer her for a chest CT, MRI, or pulmonology consultation; and lacking the proper policies and procedures to ensure the proper tests are ordered and performed. [SF-95 at 7–8.] The Air Force denied the claim, finding that the medical professionals caring for Shaima were independent contractors. [Lemieux Decl., Exhibit 2 (Docket No. 25-13).]

Malikuddin then sued the Government here under the FTCA, bringing a wrongful death claim and survival action against the Government.[7] [*See generally* Am.

---

[7] Malikuddin had filed an original Complaint also alleging, among other things, wrongful death. [Docket No. 1.] The Government moved to dismiss for lack of jurisdiction. [Docket No. 17.] In response, Malikuddin filed the Amended Complaint. [Docket No. 19.]

Compl.]  Among other things, Malikuddin claims that the Government was negligent by failing to timely approve or acknowledge the referral form to ensure Shaima received the care needed to prevent her death.  [*Id.* ¶ 81.]  Malikuddin also alleges the Government was negligent by failing to ensure Shaima received the care requested and referred in the form despite the documentation of death as a possible adverse outcome.  [*Id.* ¶ 82.]  All of the Government's actions and omissions, according to Malikuddin, led to Shaima's tuberculosis going undiagnosed, leading to the elimination of her and her baby's chance of survival and eventual deaths.  [*Id.* ¶¶ 83–92.]

The Government now moves to dismiss, arguing this Court lacks subject matter jurisdiction over this lawsuit because:  (1) Malikuddin's minor son, A.M., has not exhausted administrative remedies; (2) Malikuddin failed to exhaust his claims against HHS; and (3) the individuals responsible for the acts or omissions giving rise to Malikuddin's claims were independent contractors.  [*See generally* Gov't Br.]  Malikuddin counters, arguing, among other things, that it is too premature to dismiss this case on the FTCA independent contractor exemption.  [Pl's Mem. of Law in Opp. to Mot. to Dismiss 27-32 ("Pl's Opp. Br.") (Docket. No. 28).]  Malikuddin contends jurisdictional discovery is necessary to determine whether the independent contractor exemption applies.  [*Id.*]  Because the Court finds that the applicability of the independent contractor exemption would be dispositive to the whole case, the Court focuses its attention on that issue, and holds for another day, if necessary, the Government's presentment arguments.

## II. DISCUSSION

### A. <u>Legal Standard</u>

The Government moves to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  [*See generally* Gov't Br.]  A party may challenge subject matter jurisdiction by means of a facial or factual attack.  A facial challenge attacks the complaint without disputing its allegations, and a factual challenge presents competing facts that undermine federal jurisdiction.  *Manivannan v. U.S. Dep't of Energy*, 42 F.4th 163, 169 (3d Cir. 2022) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016)).  The Government here makes a factual attack because it relies on facts outside of the Amended Complaint to challenge this Court's subject matter jurisdiction.[8]  When presenting a factual challenge, the plaintiff must demonstrate jurisdiction exists without the benefit of the presumption of truth that attaches to the plaintiff's claims.  *Helton v. United States*, 2022 WL 17496016, at *1 (3d Cir. Dec. 8, 2022).  On a factual attack, courts are free to weigh and consider evidence outside of the pleadings.  *Davis*, 824 F.3d at 346.

---

[8] The Court is mindful that other courts in this District and the Third Circuit have found a factual challenge lodged before an answer has been filed to be premature.  *See, e.g., Blumberg v. Rolle*, 2019 WL 1529960, at *3 (D.N.J. Apr. 9, 2019) (collecting cases).  However, neither party in this case has raised any issue about whether the motion here might be premature.  That said, the Third Circuit has previously held that pre-answer factual challenges are consistent with Supreme Court precedent and the Federal Rules of Civil Procedure.  *Berardi v. Swanson Mem'l Lodge No. 48 of the Fraternal Ord. of Police*, 920 F.2d 198, 200 (3d Cir. 1990) (Alito, J.).  Indeed, the Rules provide that "[i]f the court determines *at any time* that it lacks subject-matter jurisdiction, the court must dismiss the action."  FED. R. CIV. P. 12(h)(3) (emphasis added).  Moreover, the Supreme Court has recognized that subject matter limitations are one of the "jurisdictional bedrocks" that "keep the federal courts within the bounds the Constitution and Congress have prescribed."  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  Thus, "subject-matter delineations must be policed by the courts on their own initiative even at the highest level" and courts must dismiss whenever they do not appear to have jurisdiction.  *Id.* at 583–84.

The Third Circuit has repeatedly warned courts not to allow a Rule 12(b)(1) motion to dismiss to be turned into an attack on the merits. *Id.* at 348. That said, the line between jurisdiction and merits is sometimes unclear because jurisdictional and merits questions may be intertwined. *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 343–44 (3d Cir. 2012) (citing *CNA v. United States*, 535 F.3d 132, 141, 143 (3d Cir. 2008)). If a jurisdictional issue overlaps with the merits of a claim, courts must "demand 'less in the way of jurisdictional proof than would be appropriate at a trial stage.'" *E.D. v. United States*, 764 F. App'x 169, 173 (3d Cir. 2019) (quoting *CNA*, 535 F.3d at 144).

## B. The Independent Contractor Exemption

The United States has waived sovereign immunity for some suits for injuries caused by government employees. *E.D.*, 764 F. App'x at 172 (citing 28 U.S.C. § 1346(b)). Government employees do not include "any contractor with the United States." *Id.* (citing 28 U.S.C. § 2671). In general, the key distinction between an employee and an independent contractor is the degree of power the Government has "to control the detailed physical performance of the contractor" and "whether [the contractor's] day-to-day operations are supervised by the Federal Government." *Norman v. United States*, 111 F.3d 356, 357 (3d Cir. 1997) (quoting *United States v. Orleans*, 425 U.S. 807, 814, 815 (1976)). *See, e.g.*, *Bailey v. U.S. Marshals Serv. Headquarters*, 426 F. App'x 44, 46–47 (3d Cir. 2011) (finding jail employees were contractors based on terms of contract and lack of day-to-day supervision).

Contract physicians have routinely been found not to be Government employees.  *See Carrillo v. United States*, 5 F.3d 1302, 1304 (9th Cir. 1993) (finding the circuit courts have been "unanimous" in finding contract physicians are not government employees); *see also Fontanez v. Lopez*, 2011 WL 2745809, at *9 (D.N.J. July 12, 2011) (collecting cases).  This is so because the Government usually lacks control over the provider's actions and medical decisions.  *See Moreno v. United States*, 387 F. App'x 159, 161 (3d Cir. 2010) (holding that prison medical providers were independent contractors because the Government could not control their medical judgment); *Knowles v. Ortiz*, 2020 WL 3056287, at *3 (D.N.J. June 9, 2020) (holding the court lacked jurisdiction because plaintiff received medical treatment from independent contractors); *Jackson v. Grondolsky*, 2012 WL 960450, at *11–12 (D.N.J. March 20, 2012) (finding doctor was an independent contractor by looking at the terms of the contract); *Fontanez*, 2011 WL 2745809, at *11 (finding plaintiff did not demonstrate facts showing the Government controlled the activities or medical judgments at issue); *Keefe v. Guo*, 2007 WL 2212685, at *4 (D.N.J. July 30, 2007) (holding medical personnel were independent contractors because the Department of Veterans Affairs had no power to control their detailed physical performance).[9]  But in some cases, the Government may nevertheless be responsible for injuries occurring

---

[9] *Accord Duque v. United States*, 216 F. App'x 830, 832 (11th Cir. 2007) (holding the Government not responsible because plaintiff produced no evidence that the Government controlled and supervised treatment provided by contractors); *Robb v. United States*, 80 F.3d 884, 891–93 (4th Cir. 1996) (finding that while some factors support that doctor was an employee, on balance there was more evidence he was an independent contractor, especially the intent in the contract); *Lurch v. United States*, 719 F.2d 333, 337–38 (10th Cir. 1983) (finding the details of the contract made it clear doctor was not an employee); *Bernie v. United States*, 712 F.2d 1271, 1273 (8th Cir. 1983) (finding doctors were not Government employees because they were not supervised day-to-day).

during the care of medical professionals or where the government has some degree of control over medical treatments. *See, e.g.*, *Greenland v. United States*, 661 F. App'x 210, 214–15 (3d Cir. 2016) (finding dismissal inappropriate where plaintiff alleged Bureau of Prisons officials strictly supervised contractors and that contractors operating prison needed permission from the Bureau of Prisons to schedule surgery).

At times, jurisdictional discovery is necessary to determine the degree of Government control over contractors or responsibility for the injury. *See Pacheco-Figueroa v. United States*, 2023 WL 6436703, at *5–6 (E.D. Pa. Sept. 29, 2023). "The conduct of discovery is a matter for the discretion of the district court[.]" *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 90 (3d Cir. 1987). The party seeking jurisdictional discovery must show "its necessity[,]" and a party is not entitled to such discovery if the record shows it is unlikely to produce the facts needed to survive a Rule 12(b)(1) motion. *Wright v. N.J. Dep't of Educ.*, 115 F. Supp. 3d 490, 497 (D.N.J. 2015) (quoting *Freeman v. United States,* 556 F.3d 326, 341 (5th Cir. 2009)).

Jurisdictional discovery is not a license for a fishing expedition. *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 157 (3d Cir. 2010). Accordingly, courts disfavor granting jurisdictional discovery where it would be unduly burdensome or futile. *Wright*, 155 F. Supp. 3d. at 497–98 (collecting cases); *see also Baer v. United States*, 722 F.3d 168, 176–77 (3d Cir. 2013) (ruling district court did not abuse its discretion in denying discovery where plaintiffs did not identify any evidence that would overcome the discretionary function exception); *Fitch v. Valor Healthcare*, 2025

WL 696907, at *3 (W.D. Pa. Mar. 3, 2025) (refusing discovery where party "offer[ed] nothing beyond speculative scenarios that are insufficient to overcome the contract language"); *Chapman v. United States*, 480 F. Supp. 3d 601, 607–08 (M.D. Pa. 2020) (denying request because parties did not explain what discovery would reveal nor contend that contract was applied differently than written); *Woods v. Sec'y of Hous. & Urb. Dev.*, 2017 WL 4621690, at *5 (E.D. Pa. Oct. 16, 2017) (denying discovery where "mere speculation" did not provide an adequate basis); *Wright*, 115 F. Supp. 3d at 498 (denying discovery where plaintiff did not demonstrate it would uncover key facts and desired information was likely already public); *Northlight Harbor, LLC v. United States*, 561 F. Supp. 2d 517, 528–29 (D.N.J. 2008) (denying discovery where plaintiff did not explain specifically what additional discovery would yield or how it would defeat Government's motion to dismiss). Still, courts have allowed jurisdictional discovery on the independent contractor exemption where a plaintiff reasonably raises claims that the Government may have been responsible for the harms the plaintiff incurred. *See Pacheco-Figueroa*, 2023 WL 6436703, at *5–6 (finding plaintiff is "at least entitled to discovery" where it is "not facially obvious" contractor is responsible for delays at issue and contract said referrals were "sole responsibility" of Government); *Laoye v. United States*, 2023 WL 2263670, at *5–6 (D.N.J. Feb. 28, 2023) (finding dismissal on independent contractor exemption would be "premature" because plaintiff alleged involvement and direction by ICE in his care, and allowing government to renew argument after discovery at summary judgment).

14

**C. Discovery is Needed to Determine Whether Independent Contractors are Responsible for the Alleged Negligent Actions**

Here, Malikuddin does not contest that medical professionals, generally, are independent contractors falling within the FTCA's independent contractor exemption. He argues that his claims center on "administrative failures of HHS and ORR employees to ensure necessary medical referrals were properly and timely executed." [Pl's Opp. Br. at 12.] Malikuddin argues jurisdictional discovery is necessary here to ascertain who created the ASR Form and why, as well as what was done with it, and to uncover information about the unidentified medical providers mentioned in the SF-95. [Pl's Opp. Br. at 13, 30–31.]

Jurisdictional discovery may help flesh out these issues. As Malikuddin points out, language in the contract between URS and the Government shows the Government may have exerted more control over its contractors than it lets on. The Government's own documents suggest as much. Indeed, the Government submitted the document titled "Medical Contract Requirements for Task Force Liberty at Joint Base McGuire-Dix-Lakehurst, New Jersey." These contract requirements were in effect while the Mohammadis were living at the Base. [Brost Decl. ¶ 5.] That contract required contractors to "[i]dentify patients that have critical health concerns, [and] report them to the USG representatives to expedite their processing[.]" [Med. Contract Reqs. at § 1.2.] The contract requirements also mandated that the contractors must "[c]oordinate for follow up appointments at Role 2 with staff or local hospitals and HHS for urgent care requirements[.]" [*Id.*] The Government contends that all

15

this demonstrates is that the contractors had to report to the Government and that HHS was involved in insurance processing. [Gov't Reply Mem. of Law in Further Support of Mot. to Dismiss 9 ("Gov't Reply Br.") (Docket No. 31).] True enough, but at this stage, the Court is not yet convinced. Reporting patients to the Government "to expedite their processing" suggests more involvement than a mere reporting requirement, and it is still ambiguous what following up with HHS "for urgent care requirements" means. At this stage, it is unclear whether responsibility for Shaima's injuries and death lies solely with an independent contractor. Rather, the contract documents reveal that after a contractor identifies a serious medical concern, responsibility for expediting the referral and coordinating treatment may fall at least in part on the Government. A similar level of control has led courts to allow discovery before dismissing for lack of subject matter jurisdiction on the FTCA's independent contractor exemption. *See Pacheco-Figueroa*, 2023 WL 6436703, at *5 (government responsible for referrals); *Laoye*, 2023 WL 22263670, at *6 (plaintiff alleging ICE involvement in his care).

What's more, there are open questions about the ASR Form. The Government claims the ASR Form is a "red herring" because: (1) the form was no longer in use when the events in this case transpired; and (2) the form contains missing or inaccurate information that would have been needed to process the referral. [Gov't Br. at 21; Tota Decl. ¶¶ 9, 11.] All of that may be true, but the Court is clueless on who "Oweis" actually is, why he or she filled out the ASR Form, what he or she did with it, or if he or she took any steps to request a referral that he or she clearly thought was urgent.

Discovery may help answers these questions, which would help the Court to determine whether the Government had any hand in the referral request, which is at the heart of Malikuddin's case. Because the merits of Malikuddin's claims appear to be intertwined with this Court's subject matter jurisdiction, the Court must demand less for jurisdictional proof than it would at trial. *E.D.*, 764 F. App'x at 173.

Moreover, the Court has no information about what actually happened with the ASR Form and whether the unidentified providers ever contacted the Government to expedite proceedings as the Medical Contract Requirements appear to have required. Malikuddin's allegations and supporting documents have taken this case beyond the realm of speculation. Indeed, he points to a specific provider who identified the urgent need for testing and whose actions and interactions are unknown. He also points out that contract documents required contractors to notify the Government about patients who may need emergency care. He has also pointed to the ASR Form found in Shaima's medical records. At some point, the Government required contractors to use that form to expedite referrals for patients needing emergency care. And the ultimate fate of Shaima's ASR Form is unknown. The limited record produced thus far has persuaded the Court that both independent contractors and the Government may have been responsible for issues in Shamia's care. So, at this early stage, the Court will allow jurisdictional discovery to determine whether the independent contractor exemption applies.

But the Government protests, arguing Malikuddin has not met his heavy burden to overcome the presumption against jurisdictional discovery because he seeks to

disprove the applicability of an immunity-derived bar to suit. [Gov't Reply Br. at 4.] Pointing to the Fifth Circuit's decision in *Freeman*, the Government argues jurisdictional is not proper here. *Freeman* is different.

There, unlike here, the Fifth Circuit found jurisdictional discovery unnecessary because the sought-out information "could be found in the public realm." 556 F.3d at 342. And in affirming the denial of jurisdictional discovery, the *Freeman* court emphasized the need for a more discrete and tailored discovery requests because of the purpose of immunities—to shelter the government form the burdens of answering a lawsuit more generally. *Id.* at 343. But here, the information necessary to resolve whether the independent contractor exemption applies is not in the public realm. This is especially true of information on the ultimate fate of the ASR Form. The sought-out information here may reveal, among other things, who the medical providers Malikuddin names in the Complaint actually are, what happened with the ASR Form, and the level of control the Government had over the referral process for patients needing emergency medical treatment—like Shaima apparently was. Thus, contrary to the Government's assertions, Malikuddin has demonstrated a need for discovery and a "reasonable expectation that discovery will reveal" evidence related to the applicability of the independent contractor exemption. *Baer*, 722 F.3d at 177. The Third Circuit has repeatedly stressed that where, as here, the jurisdiction and the merits of a plaintiff's claim may overlap, courts should not prematurely dismiss the case on factual attack to subject matter jurisdiction. *S.R.P.*, 676 F.3d at 344. This Court will abide by that precedent.

18

Therefore, the Court will order jurisdictional discovery. The parties shall engage in discovery that may aid the Court's ruling on whether the independent contractor exemption applies to this case.

## III.    CONCLUSION

For the reasons set forth above, the Government's Motion to Dismiss (Docket No. 25) is **DENIED WITHOUT PREJUDICE**. An accompanying Order of today's date shall issue.

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

Dated: July 25, 2025

19